NO. COA13-1289

NORTH CAROLINA COURT OF APPEALS

Filed: 2 September 2014

STATE OF NORTH CAROLINA

    v.

JAMES DOUGLAS TRIPLETT

Wilkes County
Nos. 09 CRS 54801, 10 CRS 405

Appeal by defendant from judgment entered 18 February 2013 by Judge Edgar B. Gregory in Wilkes County Superior Court. Heard in the Court of Appeals 9 April 2014.

> *Attorney General Roy Cooper, by Special Deputy Attorney General John H. Watters, for the State.*
>
> *Appellate Defender Staples S. Hughes, by Assistant Appellate Defender David W. Andrews, for defendant-appellant.*

McCULLOUGH, Judge.

James Douglas Triplett ("defendant") appeals from the judgment entered upon his conviction for first degree felony murder. For the following reasons, we grant a new trial.

## I. Background

On 19 April 2010, a Wilkes County Grand Jury indicted defendant on charges of first degree murder, robbery with a dangerous weapon, and first degree burglary. Following various pretrial motions by defendant, defendant's case came on for jury

trial in Wilkes County Superior Court on 4 February 2013, the Honorable Edgar B. Gregory, Judge presiding.

The evidence at trial tended to show that after a day of drinking and drug use, defendant, his brother Eddie Triplett, and two other men, Ben Watson and Dillon Walsh, went to the residence of Bruce Barnes ("victim") on the evening of 9 December 2009 in search of drugs. While present at victim's residence, the men got into a skirmish with victim, during which defendant fatally stabbed victim.

At trial, the State prosecuted the case on the theory that defendant, Eddie, Ben, and Dillon had planned to rob victim of his drugs and defendant killed victim in perpetration of the robbery. Defendant, on the other hand, maintained throughout trial that he was ignorant of any plan to rob victim. Defendant testified that he agreed to go to victim's house to get high and passed out on the way to victim's house. Defendant did not recall anything from the ride to victim's house. Defendant testified he woke up and came to when he heard Dillon holler "He's got a gun. He's got a gun." At that point, defendant realized Eddie and Dillon were in a fight with victim and he entered the fight. Defendant testified he did not intend to

kill victim but stabbed victim to protect Eddie, Dillon, and himself.

On 18 February 2013, the jury returned verdicts finding defendant guilty of robbery with a dangerous weapon, second degree burglary, and first degree murder under the first degree felony murder rule. The trial court then arrested judgment on defendant's convictions for robbery with a dangerous weapon and second degree burglary and entered judgment on defendant's conviction for first degree felony murder. Defendant was sentenced to life imprisonment with the possibility of parole. Defendant gave oral notice of appeal in open court following sentencing.

## II. Discussion

Now on appeal, defendant raises the following two issues: whether the trial court erred by: (1) preventing defendant from cross-examining his sister, Teresa Ogle, with a recording of a voicemail message she left for defendant's other sister in order to attack Ogle's credibility; and (2) allowing the State to use defendant's silence against him.

## Voicemail Message

At trial, defendant's sister Teresa Ogle testified as a witness for the State. During her testimony, Ogle explained

that defendant lived with her in a single wide mobile home on family land at the time of the incident in early December 2009. Although Ogle owned the mobile home, another of defendant's sisters, Connie Jennings, owned the land.

In response to questioning by the State on direct examination, Ogle described what happened the night of 9 December 2009 when defendant returned home after the altercation. On the whole, Ogle's testimony was damaging to defendant.

Specifically, Ogle testified that she worked third shift security and was getting ready for work when defendant came home on 9 December 2009 at approximately 10:40 p.m. Defendant entered the mobile home alone, but Eddie, Ben, and Dillon followed closely behind. Ogle recalled that Eddie had been stabbed in the leg and defendant's clothes were bloody. At first, defendant claimed he shot a deer and, while trying to cut the deer's throat, had stabbed Eddie in the leg. Defendant, however, quickly changed his story, admitting he killed a man and stating he was no different than Jack Keller, defendant's grandfather who killed defendant's grandmother. As the men discussed what they should do with their clothes, Ogle overheard defendant tell the other men they were going to burn their

clothes in a barrel. Yet, Ogle did not see the men dispose of their clothes because she left for work. Ogle testified that as she was leaving, defendant gave her two intertwined pot holders. Ogle claimed she did not know what was inside of the pot holders, but admitted she disposed of them over the side of a bridge on her way to work.

Ogle testified that defendant later told her that he knew Ben had planned to rob victim and that he took a knife from her kitchen before they went to victim's residence because he knew victim had a gun. Ogle confirmed that a large knife was in fact missing from her kitchen knife set.

Ogle additionally testified that sometime after defendant was arrested and charged with victim's murder, she received a phone call from defendant. Ogle recalled that during their conversation, defendant indicated he did not want her to testify against him. When Ogle said she would tell the truth, defendant began cussing, indicated that he wanted her to lie, and hung up.

On cross-examination, the defense sought to attack Ogle's credibility with questions concerning statements made by Ogle to family members that were inconsistent with her trial testimony. The defense's questions tended to suggest that Ogle played a larger role in destroying evidence following victim's death but

that Ogle was lying on the witness stand to protect herself. The defense also inquired into Ogle's mental health, drug use, and past sexual activity. When the defense asked Ogle if she remembered engaging in risky sexual behavior, the State objected and the jury was excused while *voir dire* was conducted.

Prior to the jury's return following *voir dire* and a morning break, the defense informed the court that it also intended to cross-examine Ogle with a recording of a voicemail message she left for Shay Waddell, another of defendant's sisters. With the jury still out, the court instructed the defense to play the recording of the message. In the message, Ogle made hostile statements toward Shay, calling her names, denouncing her relationship with her family, and threatening to call "the law" and the D.A.

Upon inquiry by the court, the defense explained the message was left on 5 December 2011, after the charges were brought against defendant and around the time Ogle made allegations that other members of defendant's family were threatening her to keep her from testifying. The defense contended the message suggested Ogle had something to hold over the rest of defendant's family's head through her testimony in defendant's case and argued it should be able to cross-examine

Ogle with the message to demonstrate Ogle's animus and bias towards defendant and their family.

In response to the defense's argument, the State explained that it believed the message was left in response to the family's eviction of Ogle from the family land and was not related to the charges against defendant. The State further explained that as a result of the eviction and surrounding events, Connie Jennings, the sister who owned the land, had been charged with interfering and intimidating a State's witness for her actions against Ogle. The State then objected to the introduction of the message, contending it was "unrelated to the charges [in the present case] and more related to the charges of intimidating the State's witness as well as the eviction process."

In explaining his opinion that the evidence should not come in under Rule 403, the trial judge indicated that evidence regarding what the family has done would be prejudicial to defendant, who was not responsible for the eviction or message. The court explained that introducing the message would invite evidence of the eviction that is not relevant and could mislead and confuse the jury. The trial judge then issued the following ruling:

I rule that this tape may not be played before the jury; that I really have problems with Rule 402 and whether it's relevant. I rule under 403 that the probative value is substantially outweighed by the confusion of the issues involving her eviction and the problems that she might have had with her sisters; that there is no -- it's not fair to tie whatever problem she had with her sisters to the defendant; that may be prejudicial to the defendant. He may be prejudiced by allowing that kind of evidence.

I think the same kind of things can be asked of her, whether she has hard feelings and all of that sort of thing. But I rule -- and I sustain the objection to the tape. And the tape will be made part of the record, if you would like for it be, but it may not be played before the jury.

In response to the trial court's ruling, the defense again requested that it at least be able to play the last portion of the message where Ogle threatened "to call the law and to go to the District Attorney if they keep messing with her[.]" The defense reiterated its argument that this threat was relevant for impeachment purposes because it showed Ogle's bias and Ogle's willingness to do whatever it takes to hurt defendant and his family.

Yet, the trial court stood firm, stating:

I decline that request for the same reasons, that I think it would open up an area that would be confusing to the jury; that you may ask her about any problems, if you desire, about her feelings about her family. But

anything about an eviction, it seems to me that that are things that don't relate to the defendant necessarily, and it's possible that the jury could be prejudiced towards the defendant by something that his sisters did that he didn't even know about.

. . . .

It opens up areas that are not necessary and are confusing. And under Rule 403 and the balancing test, I'm going to keep it out as the gatekeeper of the evidence.

Despite the court's ruling, defendant made it clear that "it [was his] wish that [the message] be played, notwithstanding whatever prejudice may be possible, and that it is his request that it be done and that he desires that it be played at his murder trial."

Thereafter, in response to questions concerning Ogle's relationship with her family, Ogle testified that she had no hard feelings towards defendant or her family for supporting defendant. Ogle stated she loved her family and they loved her too.

Now on appeal, defendant contends Ogle was a key witness and the trial court erred in refusing to allow his defense to cross-examine her with the message in order to show her bias and attack her credibility. Upon review, we agree with defendant.

As our Supreme Court has explained,

North Carolina Rule of Evidence 611(b) provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." *Id.*, Rule 611(b) (2005). However, such evidence may nonetheless be excluded under Rule 403 if the trial court determines "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*, Rule 403. We review a trial court's decision to exclude evidence under Rule 403 for abuse of discretion. *State v. Peterson*, 361 N.C. 587, 602-03, 652 S.E.2d 216, 227 (2007) (citing *State v. Al-Bayyinah*, 359 N.C. 741, 747-48, 616 S.E.2d 500, 506-07 (2005), *cert. denied*, 547 U.S. 1076, 126 S.Ct. 1784, 164 L.Ed.2d 528 (2006)). An abuse of discretion results when "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." *Id.* (citations and internal quotation marks omitted).

*State v. Whaley*, 362 N.C. 156, 159-60, 655 S.E.2d 388, 390 (2008). We are, however, mindful that "criminal defendants . . . must be afforded wide latitude to cross-examine witnesses as to matters related to their credibility." *Id*. at 161, 655 S.E.2d at 391.

As detailed above, in this case the trial court indicated it had serious doubts as to whether the message was relevant

and, thus, admissible under Rule 402. The trial court then excluded the evidence under Rule 403, finding the probative value of the message was substantially outweighed by confusion of the issues and unfair prejudice to defendant.

First, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2013). Upon review in this case, we hold the message relevant to attack Ogle's credibility and show Ogle's bias towards defendant and defendant's family.

As the parties explained, the message arose as a result of the family's efforts to persuade Ogle from testifying against defendant, including Ogle's eviction from the family land. Although the message would certainly be relevant in the case of intimidating a State's witness and the foreclosure proceedings, as argued by the State, the message is also relevant in the present action to show possible bias by Ogle against defendant. Moreover, the message is clearly relevant to attack Ogle's credibility as it calls Ogle's testimony that she held no hard feelings against her family into doubt.

Second, Rule 403 requires the trial court to weigh the probative value of the evidence against "the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2013). In this case, because the trial court questioned the relevance of the message, the trial court could not have properly weighed the probative value of the message against the dangers of unfair prejudice and confusion.

Moreover, defendant requested for a second and third time that the message be allowed into evidence despite the potential prejudice to his case. We find it within defendant's right to bear the risk of prejudice and cross-examine Ogle with the message. As our Supreme Court explained in *State v. Lewis*, 365 N.C. 488, 496, 724 S.E.2d 492, 498 (2012),

> [g]enerally, the trial court has broad discretion in determining whether to admit or exclude evidence, and we are sympathetic to the trial court's legitimate worry that the evidence could complicate the case to defendant's detriment . . . . However, we have long held that "[c]ross-examination of an opposing witness for the purpose of showing . . . bias or interest is a substantial legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party."

*Id*. at 496, 724 S.E.2d at 498 (quoting *State v. Hart*, 239 N.C. 709, 711, 80 S.E.2d 901, 903 (1954) (citations omitted)). Where

the defense believes the risk of informing the jury of potentially prejudicial evidence is worth taking, any error that results would be invited by defendant. *Id*. at 496, 724 S.E.2d at 498-99 (citing N.C. Gen. Stat. § 15A-1443(c)). Thus, as our Supreme Court held in *Lewis*, "[g]iven the importance this Court places on a party's right to cross-examine an opposing witness for bias," *Id*. at 496-97, 724 S.E.2d at 499, we hold it was the defense's decision to chance the risk of prejudice and the trial court erred by excluding the evidence.

We further hold defendant was prejudiced by the trial court's error. Ogle was a key witness for the State and the only witness that testified defendant was aware of the plan to rob victim. Without evidence that defendant was aware of the plan to rob victim, it is likely the jury would not have found defendant guilty of robbery and burglary, the felonies underlying defendant's conviction for first degree felony murder.

In arguing the trial court did not err by excluding the message, the State cites this Court's decision in *State v. Withers*, 111 N.C. App. 340, 432 S.E.2d 692 (1993). This Court described the situation in *Withers* as follows,

> [D]efendant[, who was charged with larceny and possession of stolen property,]

attempted to introduce a tape recording to impeach the testimony of Rita Jones and to show her motive to testify against him. On direct examination, Ms. Jones testified that she did not threaten her husband or anyone at the Stanley Rescue Squad. Defendant, however, offered a telephone answering machine tape recording [from her husband's voicemail] in which Ms. Jones profanely threatened to go to the authorities in Lincolnton and report her husband, who had been present when the property had been taken and when it had been divided.

*Id.* at 346-47, 432 S.E.2d at 696-97. This Court then affirmed the trial court's decision to exclude the recording, explaining that

[w]hile the tape in question directly contradicts Ms. Jones' earlier testimony denying making threats to "get back" at her husband, the tape does not tend to prove or disprove any of the essential elements of either crime charged. Furthermore, the threats made on the tape are not directed at defendant. On direct examination, defendant's witness, Joyce Jones, testified to the threat which Ms. Jones made, so that the impeaching evidence was disclosed to the jury. Considering these factors and the extreme profanity contained on the tape, we believe the tape posed a danger of misleading the jury, causing undue delay and being cumulative.

*Id.* at 348, 432 S.E.2d at 697.

While both cases involve the exclusion of a recorded message under Rule 403 that a defendant sought to introduce to attack the credibility of a key witness, we find the present

case distinguishable in one key respect. Among the factors considered in *Withers,* this Court noted the exclusion of the evidence was not error because the impeachment evidence came in through the testimony of another witness. *See id*. In the present case, however, the evidence defendant sought to admit was never introduced. Although the State is correct in asserting the evidence tended to show that defendant's family was "mad" at Ogle, there was no evidence that Ogle reciprocated those feelings. In fact, Ogle testified she loved her family and had no hard feelings towards them.

## Right to Remain Silent

During the State's cross-examination of defendant, the State questioned defendant on his failure to mention self-defense to investigators early in the investigation. The State then argued to the jury during closing that defendant "waited till he heard the State's case and then concocted his story to try and navigate the waters to see if he could come up with some story that [the jury] might buy and spare justice for him."

Now, in defendant's second issue on appeal, defendant contends the trial court improperly allowed the State to use his silence against him. Having already determined defendant is entitled to a new trial based on the trial court's refusal to

allow defendant to cross-examine Ogle with the recorded message, we do not address the merits of this second issue as it is unclear from the record before this Court whether the statements were made before or after defendant was in custody and Mirandized. We leave this issue for the trial court to resolve in defendant's retrial.

### III. Conclusion

For the reasons discussed above, we hold defendant is entitled to a new trial.

New trial.

Judges ELMORE and DAVIS concur.