STATE OF NORTH CAROLINA v. PAUL BRANTLEY LEWIS

No. 386PA10

(Filed 13 April 2012)

**1. Evidence— bias—investigator's remarks to juror in prior trial**

The trial court did not abuse its discretion in a retrial for first-degree sexual offense and other charges by excluding all evidence of remarks made in the first trial by the lead investigator to a juror who was also a deputy. Evidence of bias is relevant to credibility, while cross-examination to show bias or interest is a substantial legal right.

**2. Identification of Defendants— cross-examination—identification procedures**

In a prosecution for first-degree sexual offense, felonious breaking or entering, and armed robbery remanded on other grounds, the defendant on retrial was to be allowed to cross-examine both the investigators and the victim about the procedures used to identify an alleged co-defendant and whether he later established an alibi.

**3. Evidence— knife—destroyed after prior trial—testimony concerning**

In a prosecution remanded on other grounds, the trial court did not err by allowing the State to present evidence in a retrial about a knife that was allegedly used in the crime but was destroyed after the original trial. Defendant was able to challenge the victim's identification of the knife on cross-examination. In the absence of an allegation that the evidence was destroyed in

STATE v. LEWIS

[365 N.C. 488 (2012)]

bad faith, the State's failure to preserve the knife for defendant's retrial did not violate defendant's right to due process.

**4. Criminal Law— retrial—law of the case—new evidence**

In a prosecution remanded on other grounds, the trial court erred by applying the law of the case to defendant's motion to suppress a photo identification at retrial where there was new evidence that, if true, suggested that a detective may have included more than one photograph of defendant in the lineup, that the victim's identification of defendant was tainted, and that a member of the first jury knew of the taint.

**5. Criminal Law— motion to dismiss for insufficient evidence—not renewed—waiver**

In a case remanded on other grounds, defendant waived his earlier motion to dismiss by presenting evidence after the State rested; moreover, the State presented sufficient evidence to survive defendant's motion to dismiss.

On discretionary review pursuant to N.C.G.S. § 7A 31 of a unanimous, unpublished decision of the Court of Appeals, 206 N.C. App. ——, 698 S.E.2d 768 (2010), reversing judgments entered on 17 July 2008 by Judge Laura J. Bridges in Superior Court, Avery County, and remanding for dismissal of all charges against defendant. Heard in the Supreme Court on 17 October 2011.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Special Deputy Attorney General, and Anne M. Middleton, Assistant Attorney General, for the State-appellant.*

*Staples S. Hughes, Appellate Defender, by Benjamin Dowling-Sendor, Assistant Appellate Defender, for defendant-appellee.*

EDMUNDS, Justice.

In this case, we consider whether defendant Paul Brantley Lewis ("defendant") was properly denied the opportunity at his retrial to examine the State's lead investigator about the investigator's possible bias and about instances of purported misconduct by the investigator during defendant's first trial. We agree with the holding of the Court of Appeals that the retrial court erred in limiting defendant's ability to explore these matters before the jury. In addition, we consider other issues raised on appeal and conclude that defendant is entitled to a new trial.

**STATE v. LEWIS**

[365 N.C. 488 (2012)]

On 12 September 2003, defendant was convicted of first-degree sexual offense, felonious breaking or entering, and robbery with a dangerous weapon. The Court of Appeals found no error. *State v. Lewis*, 168 N.C. App. 730, 609 S.E.2d 497, 2005 N.C. App. LEXIS 432, at \*1 (2005) (unpublished) (*"Lewis I"*). Thereafter, defendant discovered information previously unknown to him relating to his trial. On 14 July 2006, defendant filed a motion for appropriate relief ("MAR") in Superior Court, Avery County, alleging that his trial had been tainted because of improper communication between the investigating detective and a juror. *State v. Lewis*, 188 N.C. App. 308, 310, 654 S.E.2d 808, 809 (2008) (*"Lewis II"*). At a hearing on the MAR, defendant presented evidence that when his case was called for trial Deputy Eddie Hughes ("Deputy Hughes" or "Hughes") of the Avery County Sheriff's Department was in the pool of prospective jurors. *Id.* at 309-10, 654 S.E.2d at 809. During the time defendant had been in custody awaiting trial, Deputy Hughes had transported him to Central Prison in Raleigh twice. *Id.* at 309, 654 S.E.2d at 809. On one of those trips, defendant told Deputy Hughes that he had failed a polygraph examination. *Id.* In addition, Deputy Hughes had assisted Detective Derek Roberts ("Detective Roberts" or "Roberts"), the lead investigator in the case, in preparing a photographic lineup for use in the investigation. *Id.* While undergoing voir dire as a prospective juror, Deputy Hughes acknowledged that he knew defendant and had discussed the case with him. *Id.* Nonetheless, while he had misgivings about serving as a juror, Deputy Hughes also stated that he believed he could be impartial. *Id.* Defendant insisted that Deputy Hughes remain on the jury and so his attorney did not exercise a peremptory challenge to remove the deputy from the panel. *Id.*

The evidence at the MAR hearing further showed that, during a break in the trial proceedings, Deputy Hughes encountered Detective Roberts, who said to Deputy Hughes that "if we have . . . a deputy sheriff for a juror, he would do the right thing. You know he flunked a polygraph test, right?" 188 N.C. App. at 310, 654 S.E.2d at 809. Because Deputy Hughes had already learned from defendant about the failed polygraph, he considered Detective Roberts' comments irrelevant and did not report them to the trial court. *Id.* Later, while testifying at the suppression hearing that preceded defendant's retrial, Detective Roberts admitted discussing the case with Deputy Hughes, though he disputed some of Deputy Hughes' details.

At the conclusion of the MAR hearing, the trial court denied defendant's MAR. *Id.* The Court of Appeals allowed defendant's

petition for writ of certiorari and reversed, finding that defendant had been prejudiced by Detective Roberts' inappropriate communication with Deputy Hughes, and ordering a new trial. 188 N.C. App. at 312, 654 S.E.2d at 811.

Venue for defendant's retrial was changed from Avery County to Watauga County, where defendant once more was convicted of all charges. On appeal, the Court of Appeals again reversed defendant's convictions and remanded the case to the trial court with instructions to dismiss the charges against defendant. *State v. Lewis*, 206 N.C. App. ——, 698 S.E.2d 768, 2010 N.C. App. LEXIS 1590, at *1 (2010) (unpublished) ("*Lewis III*"). Although the majority's mandate in *Lewis III* was based upon its holding that the trial court erred when it denied defendant's motion to dismiss at the conclusion of the State's case-in-chief, Judge Wynn argued in a concurring opinion that, because defendant's cross-examination of lead investigator Detective Roberts relating to his possible bias had been curtailed improperly, he should receive a new trial. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *25-26 (Wynn, J., concurring). On 15 June 2011, we allowed the State's petition for discretionary review as to a number of issues. For the reasons that follow, we hold that defendant is entitled to a new trial.

At defendant's *Lewis III* retrial, the State presented evidence that, in the early morning hours of 1 December 2002, the victim was sleeping in her home when she heard "rapid knocking" at the door. She got out of bed and peered through a window in the door frame. By the light of a street light and the breaking dawn, she saw two men standing on her front porch. She described one man as being "an unkempt person" with "a scruffy unshaven look" and "dirty blond hair." She added that this man was unusually tall, "much taller than the second person."

The victim "cracked" the door open approximately two to three inches to speak with the taller man, who told her he needed to use the telephone because there had been an accident on the highway. As the victim opened the door in response to what she believed to be an urgent need, the taller man "kicked the door in," causing the victim to hit an adjacent wall with her back and then fall on her hip and knee. Both men entered. The shorter walked past the victim and into her kitchen, where he rummaged through cabinets and took a bottle of her prescription medicine, along with a box of insulin syringes. He also emptied the victim's purse onto the floor and stole some of her credit cards, a debit card, and eighty dollars in cash.

At the same time, the taller intruder approached the victim, carrying a knife and unzipping his trousers. When he bent down and held the knife to the victim's throat, she could see his face. She added that she was also able to see the knife and described it as "a yellow and brown handled pocketknife" that "looked very dull and old." The assailant then "got two handfuls of [her] hair" and pulled her up toward his body, forcing her to perform oral sex. He put his penis in the victim's mouth with such force that her tooth cut her lower lip and she could not breathe. He then pushed her away, striking her on the left eye and cutting her right forearm, right hand, and breast as he attempted to slice off her nightgown with his knife. The victim feared she was going to die, so she held her breath and lay still to "play dead." She thought she may have passed out or suffered a seizure and did not hear the men leave her home.

When the victim regained consciousness, she could not stand up because of pain in her knee, so she pulled herself across the living room floor to her Lifeline unit, which she used to report the attack. Shortly thereafter, Avery County Deputy Sheriffs Danny Phillips, Dan White, and Ralph Coffey arrived at the victim's home, as did paramedics. She told the deputies what had happened and gave a brief description of her attacker and his companion. Based on the descriptions, Deputy Phillips contacted the lead investigator, Detective Roberts, and advised that he believed defendant and Alex Tsilianos might be the perpetrators.

The victim was transported by ambulance to Cannon Memorial Hospital. She described the assault to her mother, adding that her attacker smelled like exhaust fumes and "slung his arms funny" in "real jerky motions." The victim's mother immediately thought of defendant, whom she had known "probably most of his life," and with whom she associated those mannerisms. When Detective Roberts arrived at the hospital, the victim described her assailant's appearance and characteristics to him. Deputy Coffey told Detective Roberts that defendant fit the description. After the victim told Detective Roberts that she thought she could identify her assailant, he retrieved a mug shot of defendant from the Sheriff's Office. When he showed the photograph of defendant to the victim, she "became very emotional, very upset, [and] said, 'Yes, that's him.' "[1]

---

1. The record indicates that Detective Roberts also prepared a photographic lineup that, according to the opinion issued by the Court of Appeals after defendant's first conviction, consisted of a different photo of defendant and photos of six others. *Lewis I*, 2005 N.C. App. LEXIS 432, at *3. This lineup was displayed to the victim "a

STATE v. LEWIS

[365 N.C. 488 (2012)]

After the victim identified defendant's photo as depicting her attacker, Detectives Roberts and Tipton went to defendant's home. Defendant's mother was at the residence and gave the detectives a pocketknife. This knife was not available at defendant's retrial because it had been destroyed after the Court of Appeals affirmed the result of defendant's first trial, but Detective Roberts testified at the retrial that the knife given him by defendant's mother matched the victim's description of the knife used by her attacker. The victim also testified at the retrial that she had been shown a knife by an investigator and that she had recognized it as the knife used to assault her.

After the State rested, the retrial court denied defendant's motion to dismiss all the charges. Defendant then called Carolyn Lewis, his mother, who testified that she and defendant lived about a mile from the victim's house and that both of them were at home the night of 30 November-1 December 2002. She stated that she had been up cleaning until around 1:00 a.m. and had spoken to defendant before she went to bed. She testified that she saw defendant twice later that night when she used the bathroom, first around 4:00 a.m. and again at 6:00 a.m. Describing the later sighting, she testified that she forgot to turn off the bathroom light and defendant grumbled because it was shining in his eyes. She awoke for the day at 8:00 a.m. and recalled that, at around 8:30 a.m., defendant asked, "Mom, you got any coffee ready?" Defense counsel did not renew the motion to dismiss at the close of all evidence.

The jury convicted defendant of all charges, and the trial court imposed presumptive range sentences for each offense. Additional facts will be provided as needed.

[1] We begin by considering the State's contention that the Court of Appeals erred in *Lewis III* when it found that the trial court abused its discretion at defendant's retrial by excluding all evidence of the remarks lead investigator Detective Roberts had made to Deputy Hughes during defendant's *Lewis I* trial. Prior to defendant's retrial, the State, citing Rules of Evidence 401 and 403, filed a motion *in limine* to suppress all evidence "raised and litigated in an M.A.R. hearing wherein the [d]efendant was subsequently ordered to have a new trial," arguing that "[a]ny evidence or allegations of jury tampering from the first trial

_____

few days" after she was shown defendant's mug shot and she picked out defendant. *Id.* The photographs, like the knife purportedly used in the crime, were destroyed after the Court of Appeals affirmed defendant's first conviction, and no evidence relating to a photographic lineup was presented to the jury in the *Lewis III* trial. Additional issues relating to this photographic lineup are discussed later in this opinion.

**STATE v. LEWIS**

[365 N.C. 488 (2012)]

are completely irrelevant to trial of the [d]efendant on the [pending] charges." Defense counsel opposed the motion, claiming that Detective Roberts' misconduct during the first trial was directly relevant to Roberts' credibility. Defense counsel added that, even though he was aware that his questions might alert the jury to the fact that his client had been convicted in a previous trial, he intended to cross-examine Detective Roberts about the evidence raised during the MAR hearing to show that Roberts was biased against defendant. After considering the arguments, the trial court allowed the State's motion, advising the parties that:

> Due to unfair prejudice and confusion of the jury, I think that there will be substantial unfair prejudice both to [defendant] and to the State . . . I think nothing should be said about a trial having been held, or any kind of conviction, or anything that went on in that trial.

Thus, while the trial court did not explicitly cite Rule of Evidence 403, it applied the balancing test set out in that rule. Defendant appealed, *inter alia*, the retrial court's ruling on this issue to the Court of Appeals.

The Court of Appeals held that the retrial court abused its discretion in allowing the State's motion, finding both that defendant should have been permitted to cross-examine Detective Roberts regarding his misconduct because this evidence was "relevant to the jury's assessment of the truthfulness of a witness" under N.C.G.S. § 8C-1, Rule 608(b), and that the retrial court's exclusion of the evidence deprived defendant of his constitutional right effectively to cross-examine Detective Roberts under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *8-10 (majority). We agree that the retrial court should have denied the State's motion.

"A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611(b) (2012). We have long held that evidence of bias is logically relevant to a witness' credibility and that a party may cross-examine a witness regarding facts that have a logical tendency to show that the witness is biased against that party. *State v. Hart*, 239 N.C. 709, 710-11, 80 S.E.2d 901, 902-03 (1954); *State v. Sam*, 53 N.C. 115 *passim*, 53 N.C. (8 Jones) 150 *passim* (1860). In light of this relationship between bias and credibility, we next turn to Rule of Evidence 608(b), which provides that specific instances of a witness' conduct may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired

into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness." N.C.G.S. § 8C-1, Rule 608(b) (2011).

> Rule 608(b) of the North Carolina Rules of Evidence governs the admissibility of specific acts of misconduct where (i) the purpose of the inquiry is to show conduct indicative of the actor's character for truthfulness or untruthfulness; (ii) the conduct in question is in fact probative of truthfulness or untruthfulness; (iii) the conduct in question is not too remote in time; (iv) the conduct did not result in a conviction; and (v) the inquiry takes place during cross-examination. *See State v. Morgan*, 315 N.C. 626, 634, 340 S.E.2d 84, 89-90 (1986). "Among the types of conduct most widely accepted as falling into this category are 'use of false identity, making false statements on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Id.* at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979)).

*State v. Bell*, 338 N.C. 363, 382, 450 S.E.2d 710, 720 (1994), *cert. denied*, 515 U.S. 1163, 115 S. Ct. 2619, 132 L. Ed. 2d 861 (1995).

Although the State contends that the information defendant sought to elicit by cross-examining Detective Roberts about his purported statements to Deputy Hughes was not highly probative of Roberts' credibility and that the trial court properly excluded this evidence under Rule 403 on the basis of "unfair prejudice and confusion of the jury," we have observed that a conversation between a juror and a third person may be grounds for a new trial when " 'it is of such a character as is calculated to impress the case upon the mind of the juror in a different aspect than was presented by the evidence in the courtroom, or is of such a nature as is calculated to result in harm to a party on trial.' " *State v. Sneeden*, 274 N.C. 498, 504, 164 S.E.2d 190, 195 (1968) (citation omitted). Here, Detective Roberts was no mere third person who inadvertently initiated a harmless conversation with a juror. He was the lead investigator of the case, a witness for the State, and a professional colleague of the juror. In this context, Detective Roberts' remark to Deputy Hughes that a deputy sitting on defendant's jury would "do the right thing," followed immediately by a reminder that defendant had failed a polygraph test, cannot be characterized as an innocent slip of the tongue. Instead, Detective Roberts unmistakably indicated to Deputy Hughes that, as a fellow member of the Avery County Sheriff's Department, he should find

defendant guilty. Accordingly, we conclude that Detective Roberts' conduct was calculated to harm defendant at trial.

An effort to corrupt others is among the types of conduct indicative of a person's character for untruthfulness. *See Bell,* 338 N.C. at 382, 450 S.E.2d at 720. Accordingly, the retrial court should have permitted defense counsel to cross-examine Detective Roberts regarding his statements to Deputy Hughes for the purpose of showing Detective Roberts' bias against defendant, and pursuant to Rule 608(b) of the North Carolina Rules of Evidence, to probe Detective Roberts' character for untruthfulness. *See State v. Wilson,* 314 N.C. 653, 656, 336 S.E.2d 76, 77 (1985) ("We must zealously guard against any actions or situations which would raise the slightest suspicion that the jury in a criminal case had been influenced or tampered with so as to be favorable to either the State or the defendant. Any lesser degree of vigilance would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system.").

The State argues that the retrial court nevertheless properly excluded this evidence as being more prejudicial than probative under the balancing test found in Rule 403 of the North Carolina Rules of Evidence. In making her ruling, the trial judge stated, "I think that there will be substantial unfair prejudice both to [defendant] and to the State" if evidence of Detective Roberts' improper communication was admitted. Generally, the trial court has broad discretion in determining whether to admit or exclude evidence, and we are sympathetic to the trial court's legitimate worry that the evidence could complicate the case to defendant's detriment by letting the jurors know defendant had already been convicted by a previous jury. However, we have long held that "[c]ross-examination of an opposing witness for the purpose of showing . . . bias or interest is a substantial legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party." *Hart,* 239 N.C. at 711, 80 S.E.2d at 903 (citations omitted). When defense counsel advised the trial court that he planned to cross-examine Detective Roberts about his conversation with Deputy Hughes, he specifically acknowledged that evidence regarding defendant's previous trial and conviction might be disclosed as a result of his cross-examination of Detective Roberts. Even so, defense counsel believed the risk was worth taking to inform the jury of Detective Roberts' actions to prejudice that previous trial. Thus, any error that resulted from allowing this information into evidence would have been invited by defendant. *See* N.C.G.S. § 15A-1443(c) (2011). Given the importance this Court

places on a party's right to cross-examine an opposing witness for bias, we affirm the conclusion of the Court of Appeals that the trial court erred by excluding this evidence.

Next, we must determine whether the retrial court's error was prejudicial to defendant. *See Bell,* 338 N.C. at 383, 450 S.E.2d at 721.

> A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice . . . is upon the defendant.

N.C.G.S. § 15A-1443(a) (2011). Detective Roberts was the lead investigator and involved in all aspects of the case, from taking the victim's statement and showing defendant's mug shot to her while she was still receiving medical attention, to retrieving the knife from defendant's home and describing it to the jury when it was unavailable for jury inspection at the retrial. His testimony at the suppression hearing and at trial left little doubt that he had concluded defendant was the perpetrator even before he showed defendant's photo to the victim. This testimony was an important component of the State's case, but the retrial court's ruling foreclosed any possibility that defendant could probe Detective Roberts' bias, prevented the jury from knowledgeably weighing the credibility of his testimony, and excluded evidence that he may have distorted the first jury verdict. While the evidence of defendant's guilt is strong, that strength is counterbalanced by grave misconduct that extended into the jury room. Had defendant's counsel been permitted to cross-examine Detective Roberts about his behavior at defendant's first trial, there is a reasonable possibility that a different result would have been reached at defendant's retrial. Accordingly, we hold that defendant was prejudiced by the retrial court's error.

Because defendant is entitled to a new trial on the basis of the retrial court's erroneous ruling on defendant's motion *in limine,* we need not reach his claims based upon his right to confront his accuser under the Confrontation Clauses of the Sixth Amendment to the Constitution of the United States and Article I, Section 23 of the North Carolina Constitution. *State v. Crabtree,* 286 N.C. 541, 543, 212 S.E.2d 103, 105 (1975) ("It is well established that appellate courts will not pass upon constitutional questions, even when properly

presented, if there is some other ground upon which the case can be decided . . . ." (citations omitted)).

[2] We next consider several remaining issues that may arise on retrial. As noted above, investigators developed defendant and Alex Tsilianos ("Tsilianos") as primary suspects the morning of the crime. The State contends that the Court of Appeals in *Lewis III* erred when it held that the retrial court should have allowed defendant "the opportunity to demonstrate that [the victim's] identification of the alleged co-defendant [Tsilianos] was erroneous and that charges against the co-defendant were dismissed." *Lewis III*, 2010 N.C. App. LEXIS 1590, at *12. At the pretrial hearing on the State's motion *in limine* to exclude evidence relating to the resolution of charges against Tsilianos, defense counsel stated to the retrial court that the victim "was more certain of the co-defendant's identity" than of defendant's, and that Tsilianos' "charge got dismissed" because "he had an alibi." While we do not question counsel's representations to the court, our review of the record in this case and the opinion of the Court of Appeals in *Lewis I* yields no additional information as to which identification procedures were used in the investigation of Tsilianos, when any such identification was made, or the nature of the victim's response. The record is similarly devoid of information regarding the nature of any charges brought against Tsilianos or the time of and reason for the disposition of such charges.

We have stated that "[a] defendant's guilt must be determined solely on the basis of the evidence presented against him, and it is improper to make reference to the disposition of charges against a co-defendant." *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 230 (1979) (citations omitted). This rule applies when the conviction or plea of a co-defendant is offered as evidence that the defendant is guilty of the same offense. *Id.* Here, in contrast, defendant sought to introduce evidence relating to the resolution of Tsilianos' case, not as evidence that defendant shared his purported co-defendant's guilt, but both to impeach the victim's identification of defendant and to reinforce defendant's theory that any mistakes made by the investigators who almost immediately developed Tsilianos as a suspect may have been repeated in their early focus on defendant. We believe that evidence relating to any misidentification of Tsilianos is relevant when defendant based his defense on the theory that he was abed at home the morning the victim was attacked and did not commit the crime. However, in light of this sparse record, we conclude only that, on retrial, defendant may cross-examine both the investigators and

the victim about the procedures used to identify Tsilianos and whether Tsilianos later established an alibi.

[3] The State next argues that the Court of Appeals erred by holding that defendant's due process rights were violated when the retrial court admitted evidence relating to the knife allegedly used by the victim's assailant. As detailed above, the record indicates that Detectives Roberts and Tipton seized from defendant's residence a knife that Detective Roberts believed fit the victim's description of the knife used during the attack. The knife was admitted into evidence during defendant's first trial, but was destroyed after defendant's convictions were affirmed on appeal. Although the record indicates that the parties were unable to determine why this exhibit was destroyed, defendant does not argue that the destruction was carried out in bad faith.

Before defendant's retrial, defense counsel made an oral motion to limit evidence pertaining to the knife. While defense counsel conceded that the victim could testify that a knife was used in the assault, he opposed introduction of evidence that a knife recovered at defendant's house was identified by the victim as being the knife used in the attack. Defense counsel pointed out that he had never seen the knife, had never seen a photograph of the knife, and had been given no opportunity to test the knife. The State responded that evidence relating to the knife was admissible under the doctrine of "the law of the case," both because the knife had been admitted at the first trial and defendant had not challenged its admission on appeal, and because defendant had not raised this issue in his MAR that led to his retrial.

At the hearing on defendant's oral motion relating to the knife, the trial court also considered defendant's written motions to suppress evidence of the victim's identification of defendant. At the conclusion of all the arguments, the retrial court stated that "the motion to suppress is denied" without specifically addressing defendant's oral motion. During defendant's retrial, Officer Tipton, who had been chief of detectives for the Avery County Sheriff's Department at the time of the offense, testified that the victim had described the weapon as an old yellowish-brown knife with a bone handle and that he and Detective Roberts had recovered a knife matching that description from defendant's residence. Defendant did not object to this testimony.

Defendant prevailed on this issue before the Court of Appeals, which noted the State's statutory duty to preserve evidence that

possessed apparent exculpatory value and was of such a character that defendant would be unable to obtain comparable evidence. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *13-15 (citing N.C. G.S. § 15-11.1 (2009)). Observing that the knife was the only physical evidence that linked defendant to the crimes, the Court of Appeals ruled that the retrial court abused its discretion in admitting evidence of the knife. *Id.* at *14-15.

Before us, the State argues both that defendant waived this issue by not objecting when evidence of the knife was presented and by not raising a constitutional claim to the retrial court. Defendant responds that the State made neither of these procedural default arguments before the Court of Appeals and cannot raise them for the first time before us. Having allowed discretionary review of the merits of this question in response to the State's petition, and recognizing that this question may well arise on retrial, we will review the underlying issue.

The State argues that the Court of Appeals erred in finding that defendant's due process rights were violated as a result of the destruction of the knife. Specifically, the State contends that defendant failed to show that the knife had any apparent exculpatory value. As a result, the State argues, in the absence of bad faith on its part, destruction of such evidence does not constitute a denial of due process, citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281, 289 (1988) (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Defendant responds that the Court of Appeals reached the correct result and that the exculpatory character of the knife was apparent because the knife that was recovered from his residence did not match the knife described by the victim. Defendant claims that the introduction of evidence about the recovered knife during his second trial violated his due process rights.

Section 15-11.1(a) provides in pertinent part that "[i]f a law-enforcement officer seizes property pursuant to lawful authority, he shall safely keep the property under the direction of the court or magistrate as long as necessary to assure that the property will be produced at and may be used as evidence in any trial." N.C.G.S. § 15-11.1(a) (2011). When this section is violated, the Court must determine "whether defendant was thereby deprived of his rights to due process under the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina

Constitution." *State v. Mlo*, 335 N.C. 353, 372, 440 S.E.2d 98, 107, *cert. denied*, 512 U.S. 1224, 114 S. Ct. 2716, 129 L. Ed. 2d 841 (1994). This determination depends in part on the nature of the evidence. *See Youngblood*, 488 U.S. at 57-58, 109 S. Ct. at 337, 102 L. Ed. 2d at 289. The duty imposed by the Constitution on the State to preserve evidence is limited to "evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413, 422 (1984). The Supreme Court went on to hold that "[t]o meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S. Ct. at 2534, 81 L. Ed. 2d at 422 (internal citation omitted); *see also State v. Robinson*, 346 N.C. 586, 594-96, 488 S.E.2d 174, 180-81 (1997) (finding no error where there was no indication that evidence had been released in bad faith and the exculpatory value of the evidence "was speculative at best").

In applying *Trombetta* to the case at bar, we begin by noting that exculpatory evidence is "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed," 467 U.S. at 485, 104 S. Ct. at 2532, 81 L. Ed. 2d at 420, including impeachment evidence, *State v. Soyars*, 332 N.C. 47, 63, 418 S.E.2d 480, 490 (1992). The State's failure to disclose such evidence, whether in good faith or bad, violates the defendant's constitutional rights. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963). However, when the State fails to preserve " 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant,' " *Mlo*, 335 N.C. at 373, 440 S.E.2d at 108 (quoting *Youngblood*, 488 U.S. at 57, 109 S. Ct. at 337, 102 L. Ed. 2d at 289), the unavailability of the evidence does not constitute a denial of due process of law unless the defendant shows bad faith on the part of the State, *id.* (citing *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337, 129 L. Ed. 2d at 289).

In light of the evidence presented, we conclude that defendant's due process argument does not meet the constitutional materiality threshold required by *Trombetta*. 467 U.S. at 489, 104 S. Ct. at 2534, 81 L. Ed. 2d at 422. Defendant has never contended that the evidence was destroyed in bad faith. Instead, he argues that the destruction of the knife effectively prevented him from impeaching and defending against the State's evidence concerning the knife. According to defend-

STATE v. LEWIS

[365 N.C. 488 (2012)]

ant, the knife was the "only item of physical evidence that might have linked [him] to the crimes," and had the knife been available as evidence at his retrial, he would have been able to compare the recovered knife with the victim's description to show that the victim's identification of the knife obtained from defendant's residence as the one used by the attacker was not credible.

Nevertheless, even though the physical object was unavailable, defense counsel was able to challenge the victim's identification of the knife by using cross-examination to point out that the handle of the knife had been inside the assailant's hand. While cross-examining Detective Roberts, defense counsel also established that the victim's nightgown had been left bloody by the assault but that the recovered knife was tested for blood and DNA and found to be "clean." Thus, despite the knife's unavailability, defense counsel was able to elicit impeaching testimony from the State's witnesses concerning the knife. In the absence of an allegation that the evidence was destroyed in bad faith, we conclude that the State's failure to preserve the knife for defendant's retrial did not violate defendant's right to due process. *See Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337, 102 L. Ed. 2d at 289. Accordingly, we hold that the trial court did not err by allowing the State to present evidence concerning the knife.

[4] Next, the State contends that the Court of Appeals erred when it held that the retrial court should have allowed defendant's motion to suppress the victim's in-court identification of defendant. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *23. The State argues that the Court of Appeals should have applied the law of the case doctrine to uphold the trial court's ruling. The record shows that before defendant's first trial, he moved to suppress all identification testimony by the victim "on the grounds that the initial photographic identification by the victim was 'irreparably tainted by the unnecessarily suggestive' use of a single photograph in violation of defendant's due process rights." *Lewis I*, 2005 N.C. App. LEXIS 432, at *4. After considering voir dire testimony from Detective Roberts and the victim, the trial court made findings of fact, then concluded "that the single photograph identification was 'more suggestive than would be recommended by applicable North Carolina law' but was, nonetheless, 'reliable and did not produce a substantial likelihood of misidentification given the totality of the circumstances,' " and denied defendant's motion. *Id.* At the conclusion of the State's case-in-chief in defendant's first trial, the trial court admitted both the single photograph and a photo lineup that had been shown to the victim. *Id.* On appeal, the Court of Appeals affirmed the trial court's

ruling denying defendant's motion to suppress the identifications made by the victim. *Lewis I*, 2005 N.C. App. LEXIS 432, at *9-10. As with the knife discussed above, all of the pretrial photographic identification evidence was ordered destroyed after defendant's conviction was affirmed on appeal.

On 22 May and 13 June 2008, before defendant's retrial, defense counsel filed two new motions to suppress all evidence of the victim's out-of-court and in-court identifications of defendant. In both motions, defense counsel again argued that the evidence should be excluded on the grounds that defendant's due process rights were violated because the pretrial identification procedure was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." At the pretrial hearing on these motions, defense counsel and the State introduced evidence that had not been presented at defendant's first trial. Deputy Hughes and Detective Roberts gave conflicting voir dire testimony during the hearing relating to a photographic lineup that had been shown to the victim. Deputy Hughes testified that he had assisted in preparing the lineup shown to the victim during the investigation and that it included three photographs of defendant. Detective Roberts, on the other hand, testified that the photographic lineup shown to the victim contained only one photograph of defendant. Detective Roberts added that defendant had been developed as a suspect because two other investigating officers had described the alleged assailant to him and stated that they thought defendant might be the perpetrator.

After Detective Roberts and Deputy Hughes completed their voir dire testimony, defense counsel argued that the retrial court should suppress the victim's in-court identification in the upcoming trial because the pretrial identification procedures employed by Detective Roberts and other investigating officers were impermissibly suggestive and because the investigating officers did not have a reasonable basis to focus on defendant as a suspect. Defense counsel argued that the victim's description of her attacker did not match the photograph of defendant, that Detective Roberts commented to the victim when he showed her defendant's mug shot that he believed the person depicted in the photograph matched her description,[2] and that the reliability of the victim's identification of defendant was diminished by her apparent misidentification of Tsilianos as the other intruder.

---

2. When asked during defendant's retrial, the victim had no recollection of any such comment by Roberts.

The State responded that the retrial court should deny defendant's motion on the grounds that the court was bound by the law of the case. When the issue pertaining to suppression of the victim's in-court statement was considered during defendant's first appeal, the Court of Appeals found that the trial court properly denied defendant's motion to suppress the identifications made by the victim. *Lewis I*, 2005 N.C. App. LEXIS 432, at *9-10. Defense counsel conceded that the in-court identification issue had been raised during the previous appeal, but claimed that new evidence relevant to the reliability of the victim's in-court identification required the retrial court to reconsider his motion to suppress. The retrial court denied defendant's motion after making the following finding:

> On the motion to suppress, this Court finds that there is no new evidence that has been brought to light that was not brought to light in the previous motion to suppress, and this Court will not overrule the Court of Appeals, and agrees with their analysis of the matter and will adopt the findings of fact and conclusions of law of the previous judge . . . .

The retrial court did not make findings of fact or conclusions of law relating to the additional evidence presented during voir dire that had not been available before defendant's first trial.

The Court of Appeals reversed, holding that defendant's motion to suppress his in-court identification by the victim should have been allowed. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *23. The Court of Appeals held that the retrial court's finding that no new evidence had been presented was not supported by the record, and that the victim's in-court identification of defendant was not made independently of her identification of defendant from the photographic identification procedure. *Id.* at *19-20. Before us, the State maintains that the trial court was bound by the law of the case and that its ruling on defendant's motions to suppress was correct.

We have stated that:

> [A]s a general rule when an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case, both in subsequent proceedings in the trial court and on subsequent appeal, provided the same facts and the same questions which were determined in the previous appeal are involved in the second appeal.

*Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 681-82 (1956) (citations omitted). Thus, the law of the case doctrine does not apply when the evidence presented at a subsequent proceeding is different from that presented on a former appeal. As the Court of Appeals observed, the record indicates that at defendant's first trial, he did not have the information now available pertaining to Detective Roberts' improper contact with Deputy Hughes. As the Court of Appeals further observed, at defendant's first trial, the jury was presented evidence that the victim picked defendant out of a photo array purportedly consisting of a photograph of defendant and six others. *Lewis I*, 2005 N.C. App. LEXIS 432, at *3. At the hearing on defendant's motion to suppress filed before his retrial, new (albeit contested) evidence was presented indicating that the photographic lineup may have contained three photographs of defendant. Although the photos were not available at the retrial and the parties presented no evidence of the lineup to the jury, the new evidence elicited at the suppression hearing, if true, suggests that Detective Roberts may have loaded the dice by including more than one photograph of defendant in the lineup, that the victim's resulting identification of defendant in the array was tainted, and that a member of the jury that convicted defendant at his first trial knew of the taint. While we have no opinion as to the veracity of the witnesses who provided this conflicting testimony and we cannot forecast what, if any, evidence relating to the victim's in-court identification of defendant the parties will present at defendant's third trial, it is evident to us that the doctrine of the law of the case does not apply here. Accordingly, we affirm the holding of the Court of Appeals that the retrial court erred in applying the doctrine of the law of the case to defendant's motion to suppress at his retrial. We defer to the trial court any decision relating to a motion to suppress the victim's in-court identification of defendant that may be filed before or at defendant's third trial.

**[5]** Finally, the State argues that the Court of Appeals erred in reversing the trial court's denial of defendant's motion to dismiss. Defendant moved for dismissal when the State rested its case-in-chief, arguing that the evidence was insufficient. The retrial court denied the motion and defendant presented evidence. Defendant did not make another motion to dismiss at the conclusion of all the evidence. The Court of Appeals found that the only evidence identifying defendant was inherently unreliable and held that the retrial court should have allowed defendant's motion. *Lewis III*, 2010 N.C. App. LEXIS 1590, at *24-25. However, by electing to present evidence after the State rested, defendant waived

his earlier motion to dismiss. N.C. R. App. P. 10(a)(3). "Such a waiver precludes the defendant from urging the denial of such motion as a ground for appeal." *Id.* Defendant may preserve his right to appeal after such a waiver by making a motion to dismiss at the close of all evidence, *id.*, but defendant failed to do so. Moreover, while we express no opinion about any evidence that might be presented upon remand, our review of the record of defendant's retrial satisfies us that the State presented sufficient evidence to survive defendant's motion to dismiss.

For the reasons stated above, we affirm in part and reverse in part the opinion of the Court of Appeals. This case is remanded to the Court of Appeals for further remand to the Superior Court, Avery County, for a new trial.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR A NEW TRIAL.

Justice JACKSON did not participate in the consideration or decision of this case.